DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, The Toledo Hospital, has filed an original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order awarding compensation to respondent, Susan A. Lundquest ("claimant"), for permanent partial disability for loss of the right upper extremity pursuant to the scheduled loss provisions of R.C. 4123.57(B). Relator seeks an order requiring the commission to deny the scheduled loss award or, alternatively, to give further consideration to the evidence under the appropriate legal standards.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court grant a limited writ of mandamus. (Attached as Appendix A.) Respondents have filed objections to the magistrate's decision.
 {¶ 3} In claimant's first objection, she argues that it was inappropriate for the magistrate to discuss the report of Dr. Kirk J. Mauro, since the commission did not rely on that report. Claimant cites State ex rel. Yellow Freight Sys., Inc. v. Indus.Comm. (1994), 71 Ohio St.3d 139, 142, for the proposition that "evidentiary review is limited to the evidence and reasoning identified in the order."
 {¶ 4} Upon review, although the staff hearing officer ("SHO") did not rely on Dr. Mauro's report, the report was "identified" in the SHO's order. Evidentiary review of that report would therefore be appropriate under the language cited by claimant. Further, while the magistrate included Dr. Mauro's report in her findings of fact, the magistrate did not mention the report in the conclusions of law; rather, the magistrate's use of the report was limited to an incidental finding of fact, and we do not find such use inappropriate. Accordingly, claimant's first objection is not well-taken and is overruled.
 {¶ 5} In part of her second objection, claimant alleges that the magistrate incorrectly concluded that the reports of Dr. Lynn Garner (issued on April 3, 2001 and May 3, 2001) were equivocal and did not constitute reliable evidence. However, for the reasons set forth in the magistrate's report, claimant's second objection, to the extent it challenges the magistrate's findings as to the reports of Dr. Garner, is not well-taken and is overruled.
 {¶ 6} In the commission's sole objection, and as part of claimant's second objection, respondents both argue that the magistrate erred in finding that the clinical description provided by Dr. John Szczesny in his report was insufficient to establish loss of use of the entire upper extremity. In the report, Dr. Szczesny states in pertinent part as follows:
I have reviewed the information concerning Susan Lundquest's level of disability which would be secondary to her worker's comp injuries. I have also questioned and examined the patient on today's office visit. I agree that Ms. Lundquest suffers from total loss of use of her right upper extremity. She has extreme difficulty. She has lost considerable grip strength. She is not able to do simple daily maneuvers such as to tie her shoelaces or write with a pen or pencil.
In summary, I find that Susan Lundquest has a 100% disability from functional use of her right upper extremity due to injuries from a worker's comp related condition of reflex sympathetic dystrophy involving the right shoulder girdle and right upper extremity.
 {¶ 7} The magistrate apparently found that the report was not detailed enough for the commission to conclude that claimant lost the functional use of the right upper extremity due to the allowed conditions. However, as cited above, Dr. Szczesny specifically states that claimant has a "total loss of use of her right upper extremity," and the report contains findings, even if not as detailed as might be desired, in support of a determination by the commission that claimant effectively lost the use of her upper extremity (i.e., noting claimant's "extreme difficulty," the fact she has lost considerable grip strength, and is unable to perform simple daily maneuvers). Upon review, we agree with respondents that the findings of Dr. Szczensy contain "some evidence" to support the commission's decision granting loss of use compensation. See State ex rel. Frigidaire, Inc. v.Indus. Comm. (1994), 70 Ohio St.3d 166, 168 (given commission's authority to evaluate weight and credibility, its decision to rely on physician's report, although "skimpy," was not an abuse of discretion).
 {¶ 8} Accordingly, the commission's objection is sustained, and claimant's objections are sustained in part and overruled in part. Following an independent review, the magistrate's decision is adopted as to the findings of fact contained therein. However, for the reasons set forth in this decision, we do not adopt the recommendation of the magistrate, and the requested writ of mandamus is denied.
Objections sustained in part and overruled in part; writ of mandamus denied.
Klatt and Watson, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. : The Toledo Hospital, : Relator, : v. : No. 03AP-581 Industrial Commission of Ohio : (REGULAR CALENDAR) and Susan A. Lundquest, : Respondents. :
 MAGISTRATE'S DECISION Rendered on January 23, 2004 Marshall Melhorn, LLC, and Michael S. Scalzo, for relator.
Jim Petro, Attorney General, and Erica L. Bass, for respondent Industrial Commission of Ohio.
Gallon Takacs Co., L.P.A., and Theodore A. Bowman, for respondent Susan A. Lundquest.
IN MANDAMUS
 {¶ 9} In this original action in mandamus, relator, The Toledo Hospital, seeks a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order awarding compensation for permanent partial disability for the loss of the right upper extremity pursuant to the scheduled-loss provisions in R.C. 4123.57(B). Relator asks that the commission be ordered to deny the scheduled-loss award under R.C. 4123.57(B), or, in the alternative, to give further consideration to the evidence under the appropriate legal standards.
Findings of Fact:
 {¶ 10} 1. In 1993, Susan A. Lundquest ("claimant") sustained an industrial injury, and her workers' compensation claim was allowed for a strained right wrist, elbow and shoulder, and tendonitis of the right rotator cuff. The claim was later allowed for reflex sympathetic dystrophy ("RSD") of the right upper extremity and adjustment disorder with features of anxiety and depression, but disallowed for RSD of the right hip and upper leg.
 {¶ 11} 2. In January 2001, claimant was examined by David A. Miller, M.D., excluding consideration of RSD. He noted claimant's report that she had "difficulty" with tasks such as writing, dressing and lifting and that she was attempting "to limit overuse" of her right arm. Motor strength testing was "within normal limits," but the area was hypersensitive, with pain response to non-noxious stimulus.
 {¶ 12} 3. In April 2001, claimant was examined on behalf of the commission by Lynn Garner, M.D., who found that claimant had "full range of motion of all digits of the right hand, and [the] right thumb tip is opposable to the fingers." The grip of the right hand was 4-/5, which was less than the left, and claimant had hypersensitivity of the entire extremity. Dr. Garner observed slight atrophy, and the fingers were slightly cooler on the right, with slight discoloration. Dr. Garner listed ranges of motion for the right shoulder, elbow and wrist, noting that shoulder motion was markedly diminished. Dr. Garner found no thenar atrophy, however, and Tinel's sign was negative. He stated the following opinion:
In summary, Ms. Lundquest has a longstanding history of right upper extremity reflex sympathetic dystrophy with burning pain, hyperpathia, and allodynia of the right upper extremity in the distribution of the brachial plexus diffusely, with radiation from the neck all the way into the fingers. The most marked amount of discomfort is over the shoulder girdle area. Strength of the upper extremity is diminished. The right dominant extremity is essentially 100% disabled from functional use.
The patient has reached maximum medical improvement and we would certainly agree with prior examiners that she has reached MMI for some time. Certainly it has stabilized since 1998, and the present treatment is palliative in nature with the pain management physician being the primary treating physician at this time.
We have provided you with a permanent partial impairment rating according to the AMA Guides to the Evaluation of PermanentImpairment, Fourth Edition. The guidelines are quite specific for reflex sympathetic dystrophy. With this degree of involvement, with hyperpathia and allodynia involving basically the entire distribution of the brachial plexus, this would give her a 100% impairment rating of the upper extremity which is the dominant extremity, which would convert, according to the conversion table, to 60% of the whole person.
(Emphasis sic.)
 {¶ 13} 4. Based on Dr. Garner's April 2001 report, claimant filed a motion for a scheduled-loss award of permanent partial compensation under R.C. 4123.57(B).
 {¶ 14} 5. The commission asked Dr. Garner to clarify his opinion, and he issued the following corrected opinion in May 2001:
I was requested to reevaluate the disability rating that I had given as there was a question about whether I had evaluated motor, sensory and loss of motion in making my deter-mination. The patient does have what is essentially a major causalgia which according to Table 11 of the 4th Edition of the AMA Guide toEvaluation of Permanent Impairment, on page 48, describes classification due to pain on sensory deficit. In other words, it can be due to pain alone. In this patient, she has essentially involvement in the entire distribution of the brachial plexus with involvement with pain although sensation is relatively preserved. Therefore, she would fall somewhere in the grade 4 to grade 5 rating and although technically she would have a major causalgia given the distribution in the entire right brachial plexus the severity is perhaps more a grade 4 than a grade 5. Originally, I had given her the grade 5 which would be 100% "sensory deficit" although again it does not have to be a sensory deficit it can be a major causalgia. In other words, it can be decreased sensibility and/or it can be a major causalgia. In her case is was a major causalgia. When you look at the distribution which hers was in the entire brachial plexus which would give 100%, and if you multiply the percent sensory deficit to the percent of maximum upper extremity it basically gives you 100% to the upper extremity. However, if we reevaluated her and put her in a 60% of the whole person, which for a minor causalgia, would be a grade 4 according to Table 11 and then look again at Table 14 on page 52, with involvement of the entire brachial plexus distribution that would put her in a 60% of the upper extremity. However, when you add to this her combined values for her loss of motion — shoulder motion showed flexion of 80% with is 7% of the upper extremity, extension 10% or 2% of the whole person, abduction 70 degrees or 5% of the whole person, adduction 10 degrees or 1% of the whole person, external rotation to neutral or 2% of the upper extremity and internal rotation 10 degrees or 5% of the upper extremity. Adding these together gives you 2% of the upper extremity for shoulder. Elbow she had 20 degrees giving her 2% upper extremity and 110 degrees flexion or 4% of the upper extremity gives a total of 6% to the elbow for the upper extremity involvement and then for the wrist I came up with a total of 13% of the upper extremity. Using the combined valueschart adding 22, 13, 6 came up to 36% of the upper extremity and60 + 36, using the combined values is giving you 74% of the upperextremity which converts to 44% of the whole person. I think thisis probably a fairer impairment of the whole person rather than the 60% given the degree of involvement for her RSD. It certainly would not be the equivalent of having a permanent brachial plexus injury with a permanent sensory and motor deficit as she doeshave some function of the upper extremity. Nonetheless theGuidelines are somewhat liberal here and I believe I have taken a fair middle road between under and over assignment of impairment here.
(Emphasis added.)
 {¶ 15} 6. In October 2001, claimant was granted an award for permanent partial disability based on a finding of 52 percent disability of the whole person due to impairment of the right upper extremity.
 {¶ 16} 7. In February 2002, claimant's treating physician, John M. Szczesny, M.D., provided the following opinion:
* * * I agree that Ms. Lundquest suffers from total loss of use of her right upper extremity. She has extreme difficulty. She has lost considerable grip strength. She is not able to do simple daily maneuvers such as to tie her shoelaces or write with a pen or pencil.
 {¶ 17} 8. In April 2002, claimant was examined by Kirk J. Mauro, M.D., who noted claimant's report regarding her daily activities:
* * * She is independent with feeding, grooming, dressing, and bathing [but] occasionally has difficulty with bra hooks with use of the right hand She tells me she tries using her right hand as much as possible. She rates her right upper extremity pain today as a 9/10. She tells me she wears a wrist support most of the day but does not sleep in this. * * *
On examination, Dr. Mauro found flexion of the right shoulder to approximately 70 degrees with verbalization of pain, with extension to 30 degrees and abduction to 50 degrees. The right elbow flexed to about 100 degrees and extended normally, with full pronation and supination. Claimant had wrist flexion and extension to about 40 degrees with functional ulnar and radial deviation, but with complaints of pain. Dr. Mauro found no atrophy, including no muscular atrophy and no thenar or hypothenar atrophy. Measurement showed symmetrical size of the arms, forearms, wrists and hands.
 {¶ 18} Grip testing of the right hand showed "some inconsistency." On three tries, the right hand grip was zero pounds, 12 pounds, and 16 pounds, with left grip at 40, 60 and 42. Reflexes were 2/4 in the biceps and triceps on both sides, with 2/4 of the left brachioradialis compared to 1/4 on the right. The motor examination was 3/5 on the right, compared to 5/5 on the left, due to limited active range of motion. With any type of resistance, there was giveway response. Sensory exam revealed hypoesthesia in a nonanatomoic distribution and complaints of hyperesthesia diffusely through the entire extremity. In conclusion, Dr. Mauro reached the following opinion:
* * * Objectively, if someone had RSD for approximately eight years I would expect this patient to have some atrophy. I would expect her to have the longer condition of RSD with progression of the stages. There is no obvious atrophy. There is no fingernail changes, although she complains that they are brittle. There is no atrophy of the intrinsic musculature and she seems to have use of the right hand She tells me she continues to try to use this extremity. It is possible that she has constant grade 1 although, despite her complaints of pain, she seems to be rather functional. The patient has had thirteen stellate ganglion blocks and none have proven beneficial. She tried therapy and this did not help. The patient, in my opinion, has had previous incomplete workup. An MRI scan will not show RSD. I believe a triple phase bone scan would prove beneficial. This bone scan must be triple phase. I also recommend x-rays of the right upper extremity to determine if there is any osteopenia, which would be noted after eight years with loss of calcium from the bone itself. I also recommend that Dr. Szczesny consider the use of a Clonidine patch, as this is known to be beneficial to decrease right upper extremity symptomatology. I am not a believer in OxyContin, as I believe this is a significantly addicting drug. It has had a multitude of side effects, as is well documented in both the medical literature and general publications, including newspapers, for the significant side effects and street value. If Ultram was not a true allergy but rather a GI upset issue I recommend they consider Ultracet, which is better pain relief, quicker onset, and less GI irritation.
* * * I do not believe there is total loss of use of the right upper extremity, as the patient tells me she uses the hand for assist with activities, such as activities of daily living. * * *
 {¶ 19} 9. In April 2002, a district hearing officer denied compensation for loss of use of the right upper extremity. Although finding significant permanent injury to the right upper extremity, the district hearing officer found that claimant maintained some residual functional use of the arm for activities of daily living and, therefore, had not sustained complete loss of use of the right upper extremity.
 {¶ 20} 10. On appeal, a staff hearing officer ("SHO") ruled as follows:
Dr. Garner stated that "the right dominant extremity is essentially 100% disabled from functional use" (emphasis added). In an addendum report dated 5/3/01, Dr. Garner retracted his impairment rating from 100% to 75% of the right upper extremity.
However, Dr. Garner did not retract his previously stated opinion that the injured worker suffers from a 100% functional loss.
The report of Dr. Mauro dated 4/8/02 reveals that the injured worker had significantly less grip strength on the right versus the left. Dr. Mauro focused on the lack of a triple phase bone scan and appears to question the existence of the allowed condition of reflex sympathetic dystrophy.
This Staff Hearing Officer finds that the reports of Dr. Szczesny and Dr. Garner are most persuasive that the injured worker has lost all functional use of the right upper extremity due to the allowed conditions.
Therefore, it is the order of this Staff Hearing Officer to GRANT the injured worker a total loss of use of the right upper extremity. Pay the award under O.R.C. 4123.56(B), pursuant to the Industrial Commission/Bureau of Workers' Compensation rules and regulations.
It is further ordered to pay the loss of use award less any permanent partial disability awarded previously pursuant to District Hearing Officer order of 10/23/01 and Staff Hearing Officer order dated 12/18/01.
This order is based upon the report of Dr. Garner (4/3/01) and the report of Dr. Szczesny (2/19/02).
(Emphasis sic.)
 {¶ 21} 11. Further appeal was refused.
Conclusions of Law:
 {¶ 22} In the present action, the employer contends that the commission abused its discretion in granting scheduled-loss compensation under R.C. 4123.57(B) for the loss of the right upper extremity. The employer argues that the medical evidence on which the commission relied does not constitute "some evidence" on which the commission could rely to find total loss of use of the right upper extremity. For the reasons set forth below, the magistrate finds an abuse of discretion and recommends that a limited writ of mandamus be granted.
 {¶ 23} R.C. 4123.57(B) sets forth specific amounts of compensation for the loss of specific body parts as listed. However, an award for the "loss of" an arm or leg is not limited to situations where the limb was lost due to amputation; injured workers may recover for the total loss of use of a listed body part. State ex rel. Walker v. Indus. Comm. (1979),58 Ohio St.2d 402. The Ohio Supreme Court has recently reiterated that the claimant must "prove that the affected area is as useless as if it had been amputated." State ex rel. Franks v. Indus.Comm., 99 Ohio St.3d 35, 2003-Ohio-2456 ¶ 24. See, also, id. at ¶ 27 ("A loss of use of a body part is compensable when it is `to the same effect and extent as if [it] had been amputated or otherwise physically removed.'").
 {¶ 24} The magistrate recognizes that, in the original decisions involving loss of use, the facts involved the loss of a worker's legs due to total paralysis from the waist down. Stateex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64;Walker, supra. However, a limb need not hang limply without all motion or feeling in order for the commission to award compensation under R.C. 4123.57(B). The courts have approved scheduled-loss awards for the loss of a limb where the limb or stump can still serve as a post, having some feeling and slight movement but with no more use than a prosthesis would provide. E.g., State ex rel. White v. U.S. Gypsum Co. (Sept. 22, 1988), Franklin App. 87AP-336 (noting that the leg was useless except in the nature of a "peg leg").
 {¶ 25} In the present action, therefore, the issue before the commission was whether the claimant has sustained a "loss of use" of the right upper extremity. The magistrate rejects the argument that the commission was obliged to state expressly whether the loss of use was the same as if the limb had been "amputated." As long as the commission addresses the question of whether the injured worker sustained a total loss of use, neither the commission nor a reporting physician must include reference to the concept of amputation when discussing a total loss of use.
 {¶ 26} With respect to medical opinions, the magistrate further notes that an ambiguous or equivocal opinion cannot support a commission decision. Similarly, a medical report cannot constitute "some evidence" if the report is internally inconsistent or contradicts another report by the same physician. E.g., State ex rel. Chrysler Corp. v. Indus. Comm. (1998),81 Ohio St.3d 158; State ex rel. Eberhardt v. Flxible Corp.
(1994), 70 Ohio St.3d 649; State ex rel. Malinowski v. HordisBros., Inc. (1997), 79 Ohio St.3d 342. In some cases, a subsequent opinion from a physician may clarify an ambiguity existing in the prior opinion and the opinion as a whole then constitutes evidence on which the commission may rely in its discretion. In other cases, however, a subsequent report maycreate an ambiguity or inconsistency, thus removing evidentiary value from both opinions. See, generally, Eberhardt; Chrysler.
 {¶ 27} In the present action, the commission stated reliance on the April 2001 opinion of Dr. Garner. However, Dr. Garner rendered a new and corrected opinion in May 2001 with respect to the impairment and function of the right upper extremity. In the latter opinion, Dr. Garner stated a different conclusion regarding numerical percentage of impairment, setting it at 74 percent rather than 100 percent and explaining that the new assessment was a "fairer" evaluation of impairment. Accordingly, the May 2001 opinion represented a substantial modification of the impairment opinion.
 {¶ 28} In his initial opinion, Dr. Garner had opined not only that claimant had "a 100% impairment rating of the upper extremity," but he had also opined initially that the extremity was "essentially 100% disabled from functional use." Subsequently, Dr. Garner not only retreated from the impairment-percentage opinion (explaining that claimant had not
sustained a 100% impairment of the right upper extremity), but he also indicated with regard to functional use that claimant hadnot sustained a complete loss of function: Dr. Garner explicitly stated in May 2001 that the severity of claimant's injury would not be the equivalent of having a permanent brachial plexus injury with a permanent sensory and motor deficit because "she does have some function of the upper extremity." (Emphasis added.)
 {¶ 29} Claimant argues, however, that Dr. Garner withdrew only one of his "100%" statements. Claimant contends that Dr. Garner explicitly withdrew only his opinion that claimant had "a 100% impairment rating of the upper extremity" and did not
explicitly withdraw the accompanying opinion regarding "100% disabled from functional use," despite his express clarification that claimant retained "some function" of the extremity. Claimant asserts that the absence of an explicit retraction means that the phrase regarding "100% * * * functional use" could be relied upon as wholly unaffected by the other accompanying changes to the medical opinion.
 {¶ 30} The magistrate disagrees. At least two material changes were stated in the May report that explicitly altered the prior report — that the right upper extremity was not "100%" impaired but was only "74%" impaired, and that the claimant, rather than having essentially "no" function of the extremity, retained "some" function. At the very least, the new report created a fatal ambiguity as to whether Dr. Garner believed that claimant had sustained a total loss of use of her right upper extremity.
 {¶ 31} Given Dr. Garner's significant modifications to his impairment/disability opinion in May 2001, the commission acted unreasonably in isolating a single phrase from his April 2001 opinion and asserting it could rely on that phrase simply because Dr. Garner had not expressly retracted it. Essentially, the commission's order proposes that the concepts of impairment and functional use are so different and distinct that a physician's explicit modification of his opinion on "impairment" of a limb can be completely divorced from his opinion on functional "use" of the limb. The commission cites no authority, however, for the proposition that medical "impairment" of an upper extremity is based on something wholly distinct from the functional use of that extremity. Therefore, the commission abused its discretion in concluding that the April opinion as to lost function was unaltered and unequivocal after the May opinion was rendered.
 {¶ 32} In sum, Dr. Garner's April opinion regarding functional use was rendered ambiguous by his May statements regarding impairment and function, and, therefore, the commission abused its discretion in relying on the April opinion. The only other report cited by the commission was Dr. Szczesney's report, which standing alone cannot support the commission's decision. Dr. Szczesney's only specific observation regarding claimant's function and/or impairment was that the claimant had "lost considerable grip strength" of her hand and that she was unable to use her right hand to perform maneuvers such as tying shoelaces or writing. That clinical description of the hand is insufficient, however, to establish loss of use of the entire upper extremity.
 {¶ 33} In this action, the medical reports cited by the commission were not merely susceptible to differing interpretations but were legally insufficient to support the commission's order. A limited writ of mandamus is warranted directing the commission to vacate its order under R.C.4123.57(B) and to issue a new decision citing "some evidence" and providing a rationale in compliance with State ex rel. Mitchellv. Robbins Myers, Inc. (1983), 6 Ohio St.3d 481, and State exrel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. As to whether the commission should seek further clarification from Dr. Garner or obtain a new specialist's report, or proceed with the medical reports currently on file, these matters are best left to the commission's sound discretion.
 /s/ P.A. Davidson
P.A. DAVIDSON MAGISTRATE